UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRIAN BUSTER,<br>　　　Plaintiff<br>v.<br><br>HOME DEPOT U.S.A., INC.,<br>　　　Defendant | :<br>: CIVIL ACTION NO.<br>: 3:06-CV-486 (JCH)<br>:<br>: JANUARY 16, 2008<br>: |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 45]**

Plaintiff Brian Buster brings this employment discrimination action against defendant Home Depot U.S.A., Inc. ("Home Depot"). Buster, an African-American, alleges that Home Depot fired him from his job as a Loss Prevention Investigator ("LPI") because of his race. Home Depot claims that Buster was fired for performance reasons, and it has moved for summary judgment. See Doc. No. 45. For the reasons that follow, the court **DENIES** defendant's Motion.

## I.   STANDARD OF REVIEW

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all

1

inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## II.     FACTUAL BACKGROUND[1]

Home Depot hired Buster as an LPI on September 27, 2003. As an LPI, one of the key parts of Buster's job was to patrol a Home Depot store and attempt to prevent the theft of merchandise. In connection with this, after being hired, Buster received training on Home Depot's policy guidelines. These guidelines contained a statement that "[a]ny violation of the Guidelines may subject you to disciplinary action up to and including termination."

Included within these Guidelines were what were known as the "Apprehension Guidelines." The Apprehension Guidelines contained a "five-step" approach that LPIs were instructed to use before "making an apprehension" of a suspect. These five steps were:

---

[1] For the purposes of the instant Motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the plaintiff where there is evidence to support his allegations. To the extent that plaintiff merely relies on the allegations in his Complaint, however, the court deems that insufficient to create a disputed issue of fact. See Fed. R. Civ. P. 56(a) ("When a motion for summary judgment is made . . . an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading . . . .").

> [1.] Observe the subject in the area without the company's merchandise.
>
> [2.] Observe the subject select the company's merchandise.
>
> [3.] Observe the subject conceal the company's merchandise (if applicable).[2]
>
> [4.] Maintain continuous observation of the subject. Continuous observation may be accomplished by one or more trained and certified associates.
>
> [5.] Observe the subject pass all points of payment to ensure the intent to pay for the merchandise was not present.

During Buster's training, Home Depot managers specifically told Buster that it was important to follow these five steps, as doing so shielded Home Depot from liability for incorrectly detaining customers, and avoided violent reactions from incorrectly detained customers.

On a date in late January 2004, Buster was on duty at the Derby, Connecticut store. A sales clerk informed Buster that two customers had asked to have keys made, and that the clerk had witnessed them take their keys past checkout without paying for them. Buster himself did not personally observe the customers do any of these actions.

Buster proceeded to walk outside the store after the customers and went into the parking lot. He came within five feet of their vehicle[3] as they unloaded merchandise

---

[2] The Apprehension Guidelines contain a footnote specifically indicating that this step is not applicable in cases where the merchandise is in plain view.

[3] Buster contends that he was not specifically following the customers when he exited the store. Buster Dep. at 28-29. However, he agrees that when he walked up to their vehicle, he was specifically stopping to observe them. Id. at 30-31. In his deposition, he also agreed that when he chose to come up close to the customers, he did so primarily because of the information the clerk gave him. Id. at 36-38.

from their shopping cart. After Buster approached them, one of the customers stated that he recognized Buster as "security." The customer pointed to a pair of gloves sticking out of his jacket, and he told Buster that he had not taken these from the store. Buster replied that it was "no problem," although he walked away slowly and continued to observe the customers as they got into the vehicle and drove away. Buster acknowledges that because he had not personally observed the customers take the keys and fail to pay for him, if his actions are deemed to be an apprehension, he did not act in accordance with the five steps of the Apprehension Guidelines. Plaintiffs' Loc. R. 56(a)(2) Stat. at ¶ 20. However, because the five steps only apply to "apprehensions," if Buster had not actually stopped the customer it would appear that he had committed no violation of the Guidelines.[4]

An Assistant Manager, whom Buster did not know, later approached Buster and told him that a customer had called to report that he had been stopped. Buster denied actually stopping or apprehending the customer. Buster Dep. at 34-35. Jeff Rourke, the district manager, then phoned Buster at the store to discuss the situation that had developed in the parking lot. Buster again denied that he had actually stopped the customer. Id. at 39-40.

Aside from Rourke and the unnamed Assistant Manager, no other member of Home Depot management ever spoke to Buster about this incident. Id. at 40-41. Nonetheless, Home Depot claims that on January 30, 2004, one of its managers

---

[4] When deposed, Home Depot's Regional Loss Prevention Manager was unable to say whether or not an "apprehension" and an "approach" were the same thing. Sheiner Dep. at 53. A reasonably jury could conclude that the two are not the same thing.

4

prepared a written Discipline Notice about the incident. Defendant's Exh. 6. The Notice in the record purports to describe what happened in the parking lot, and it states, inter alia, that Buster's "approach[] did not follow co[mpany] policy [r]egarding the 5 steps needed to make an apprehension." Id. The Notice is signed by Howard Edwards, who at the relevant time was the manager of the store in Fairfield, not the store in Derby.[5] Id.; Defendant's Exh. 9. The Notice states that on the date of the Notice, Buster will receive counseling on the five-step method. Defendant's Exh. 6.

Buster contends that the first time he ever saw this Notice was in August 2005, at a hearing before the Connecticut Commission on Human Rights and Opportunities (CHRO). Buster Dep. at 41. He also contends that he was never given any counseling on the five-step method following the parking lot incident. Id. at 42-43. It is worth observing that the Notice contains a space for Buster to sign and acknowledge that he had received the Notice; Buster's signature is noticeably missing. Defendant's Exh. 6. According to Deborah Sheiner, Home Depot's Regional Loss Prevention Manager, it was company practice to have employees sign such notices when they received them. Sheiner Dep. at 56.

A second incident took place on February 26, 2004, while Buster was on duty in the Fairfield, Connecticut store. An associate in the lumber department, Alan Werner, called Buster over to discuss a customer. Werner stated that the customer had asked him to lower the price on a new door. Werner also stated his belief that the customer

---

[5] Although the incident occurred while Buster was on duty in Debry, his primary assignment was to the Fairfield store. Buster was assigned to the Derby store on the day of the incident because the Derby store had recently lost its LPI. Buster Dep. at 33.

might have an <u>unsigned</u> "markdown" sheet for the door; a <u>signed</u> markdown sheet would be sufficient to give the customer a discount.  Prior to talking with Werner, Buster had not personally observed the customer in question.

Buster then saw the customer remove a door from his shopping cart and replace it with another door.  Werner reiterated his concern that the customer would attempt to receive an unauthorized discount.  Buster observed the customer make his way to the cashier and present a sheet, but he was not close enough to determine if this sheet was a discount sheet for the door.  After the customer completed check out and began moving towards his vehicle, Buster stopped the customer (and two individuals with him).  He asked them to come back inside the store, and he also asked to see their receipt.  Upon viewing the receipt, Buster realized that the customer had paid full price for the door.  The customer became extremely angry and upset.  Buster did not immediately release him, however, and Buster instead phoned his Loss Prevention Manager, Tom Kasper.  Kasper told Buster to release the customer immediately, which Buster then did while apologizing to the customer.  The customer was still very upset, and he immediately returned all of the items that he had just purchased from Home Depot.

That evening, Kasper asked Buster to prepare a written report of the incident, which Buster did.  Other employees also prepared written reports.  The reports were ultimately reviewed by Sheiner (the Regional Loss Prevention Manager) and Sharon Flagg, the Regional Human Resources Manager.  Sheiner, with the assistance of Flagg, decided to terminate Buster's employment.  According to Sheiner, Buster was fired because he failed to follow the five-step method on "two occasions in a very short time frame."  Sheiner Dep. at 86.  Sheiner also testified that she considered Buster's

6

second violation to be egregious because "[h]e relied on other people. He detained a customer. He had many opportunities to ask questions of other people before detaining the customer." Id. at 87. There is no dispute that Buster's actions during the door incident failed to comply with the five-steps.

Buster was notified of his termination on March 2, 2004. He was given a Disciplinary Notice, which he refused to sign.[6] The Notice states that Buster had not received any prior disciplinary notices within the previous 12 months.

Prior to being fired, Buster had met Sheiner on three different occasions at the Fairfield store. Buster had never met Flagg. There is no evidence that Sheiner, or any other member of Home Depot Management, ever made any negative comments about Buster's race.

Several months after his termination, on June 12, 2004, Buster began employment at Wal-Mart working in security. He worked there until September 2006, when he left his employment voluntarily. At the time he started working at Wal-Mart, his salary was $12 an hour; by the time he left his salary had increased to $13.20 an hour. At Home Depot he had been making $15 an hour.

Meanwhile, on March 6, 2006, shortly after receiving a right to sue letter from the EEOC, Buster filed a three-count Complaint in state court. Buster alleged that his termination violated: (1) Title VII's prohibition on racial discrimination in employment, see 42 U.S.C. § 2000e-2(a); (2) a similar provision in the Connecticut Fair Employment

---

[6] Unlike the purported January 30, 2004 Notice, which has a blank signature line, the March 2, 2004 Notice has the words "Refused to Sign" written on the signature line. Defendant's Exh. 7.

Practices Act ("CFEPA"), see Conn. Gen. Stat. § 46a-60(a)(1); and (3) 42 U.S.C. § 1981. Home Depot promptly removed the case to federal court, alleging diversity jurisdiction.[7]

## III. ANALYSIS

### A. Liability for Employment Discrimination

Although Buster brings suit under three different statutes, his claims under all three are analyzed by using the burden shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004); Brittell v. Dept. of Corr., 717 A.2d 1254, 1264 (Conn. 1998). This means that Buster must first establish a prima facie case of racial discrimination. Graham, 230 F.3d at 39. If Buster successfully does so, the burden shifts to Home Depot to articulate a legitimate, non-discriminatory reason for its actions. Id. Once Home Depot articulates such a reason, the burden shifts back to Buster to prove that discrimination was the real reason behind his employer's actions. Id.

To establish a prima facie case of discrimination, Buster must demonstrate: (1) that he is part of a protected class; (2) that he was qualified for his position; (3) that he suffered an adverse employment action; and (4) that the circumstances surrounding that employment action give rise to an inference of discrimination. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). The Second Circuit has "often emphasized [that] the burden of establishing this prima facie case in employment discrimination cases is 'minimal.'" McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir.

---

[7] Federal jurisdiction exists over the state law claim by virtue of 28 U.S.C. § 1367.

8

2001). Additionally, because of the diversity of fact patterns presented in employment discrimination cases, the requisite quantum of evidence will vary from case to case. Id.

The defendant does not dispute that Buster has met the first three elements of the prima facie case. Instead, Home Depot concentrates its attack on the fourth element: it contends that Buster has failed to introduce evidence that gives rise to an inference of discrimination. Doc. No. 47 at 7-9.

One way a plaintiff can create such an inference is by introducing evidence that similarly situated individuals of a different race were treated differently. See, e.g., Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999). In this case, Buster contends that several non-black LPIs received less harsh treatment for violations of the five-step policy. In particular, Buster points to the cases of Paul Cruz and Luis Gonzalez, two Home Depot LPIs who violated the five-step policy on at least one occasion and were not terminated. See Plaintiff's Exh. 3; Buster Dep. at 68. Neither Cruz nor Gonzalez is African-American.[8]

In order for Cruz and Gonzalez to be appropriate reference points, they need not be identically situated to Buster. McGuinness, 263 F.3d at 54. However, they do need to be similarly situated in all material respects. Id. Home Depot argues that they were

---

[8] Plaintiff points to nothing in the record that affirmatively states the race of Cruz and Gonzalez. However, based on their surnames, a jury could reasonably conclude that Cruz and Gonzalez were Hispanic.
  Plaintiff also attempts to rely on the case of LPI Jason Greene. See Plaintiff's Exh. 2. However, plaintiff points to absolutely no evidence in the record that would indicate Greene's race.
  Finally, plaintiff also attempts to rely on vague statements that certain other LPIs may have violated the five-steps but were not terminated. See Buster Dep. at 65-69; Plaintiff's Exh. 1 at 13-17. It is not clear that these statements constitute admissible evidence, nor does plaintiff's evidence appear to indicate the race of these individuals. Because it does not affect the outcome, the court will assume that this additional evidence does not assist Buster's case.

9

not similarly situated because they had only committed one violation of the five-step process, whereas Buster committed two violations of the five-step process within a short time frame.  See Doc. No. 47 at 8; Doc. No. 59 at 6-8.

Home Depot's argument fails because it ignores evidence that the parking lot incident <u>did not</u> constitute a violation of the five-step process.  As discussed above, a reasonable jury could conclude that the five-step process only applies to <u>apprehensions</u> – that is, to situations in which an LPI actually detains a suspected shoplifter.  If Buster's version of the events is credited, he never actually detained the customers in the parking lot, or even questioned them about any suspected theft.  Instead, he merely approached them.

Furthermore, Buster has presented evidence to suggest that Home Depot managers believed Buster had committed no violation.  A jury could find that Buster was never given any Discipline Notice on January 30th, and that he never received any counseling following the parking lot incident.  Indeed, a jury could conclude that Home Depot only retroactively created the Disciplinary Notice after Buster had accused the company of discrimination in the CHRO proceeding.  In light of all of this, a rational jury could infer that Buster's managers did not believe he had violated the five-step method during the parking lot encounter.

A reasonable jury could permissible find that Buster was similarly situated to two non-Black workers, and yet treated differently.  This is sufficient for Buster to complete his prima facie case.

The next step in the <u>McDonnell-Douglas</u> analysis requires Home Depot to articulate a legitimate, non-discriminatory reason for its actions.  Here, Home Depot

claims it fired Buster because he had two violations of the five-steps in a short period of time, and because his second violation was "egregious."[9]

As discussed above, however, a jury could conclude that Buster had committed only one violation of the five steps. Additionally, a jury could find that Sheiner's explanation of the "egregiousness" of the "second" violation was not internally consistent. For instance, Sheiner stated that she deemed Buster's actions egregious in part because "[h]e could have asked questions of the cashier to find out whether or not that markdown even occurred." Sheiner Dep. at 87. Yet part of her criticism of Buster was that he "relied on other people" rather than making his own first-hand observation of theft.

Accordingly, a jury could conclude that Home Depot's proffered reason was pretextual, and that the true reason was discrimination. Of course, other conclusions are certainly possible based on the evidence in the record, but Buster has presented sufficient evidence to entitle him to a jury trial.

B. Damages

Home Depot argues that, even if it is not entitled to summary judgment on liability, it is still entitled to summary judgment on an issue related to damages because of an alleged failure to mitigate.

Title VII plaintiffs seeking back pay have a duty to mitigate damages, see Ford

---

[9] It is not clear from Sheiner's deposition whether or not she considered the "egregiousness" of the second violation to be independent of the first violation. That is, it is unclear from her testimony if she still would have considered Buster's second incident to be an "egregious" one if she had not deemed Buster to have committed a prior violation. See Sheiner Dep. at 86-89.

Motor Co. v. EEOC, 458 U.S. 219, 231-32 (1982), and thus a plaintiff cannot collect back pay if he fails to make reasonable efforts at finding comparable employment. Hawkins v. 1115 Legal Serv. Car, 163 F.3d 684, 695-96 (2d Cir. 1998). The employer bears the burden of demonstrating a failure to mitigate. Id. at 695.

Home Depot notes that Buster voluntarily quit his job at Wal-Mart, and it appeals to the principle that "a claimant who voluntarily resigned from comparable employment for personal reasons [has not] adequately mitigated damages." Id. at 696. However, "'[A] voluntary quit does not toll the back pay period when it is motivated by unreasonable working conditions or an earnest search for better employment.'" Id. (quoting EEOC v. Delight Wholesale Co., 973 F.2d 664, 670 (8th Cir. 1992)). Here, Buster testified at his deposition that he left Wal-Mart because he "[c]ould not advance" and was not paid enough money. Buster Dep. at 79. In light of the fact that Buster's salary at Wal-Mart was lower than his salary had been at Home Depot, a jury could conclude that Buster's decision to leave Wal-Mart did not violate his duty to mitigate damages. Summary judgment on this damage issue is inappropriate.

## IV. CONCLUSION

Home Depot's Motion for Summary Judgment [Doc. No. 45] is **DENIED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 16th day of January, 2008.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge